IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| LONDIAE N.H.,[1] | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 3:20-CV-01224-MAB |
| | ) |
| COMMISSIONER OF SOCIAL SECURITY, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM AND ORDER

**BEATTY, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), Plaintiff seeks judicial review of the final agency decision denying her application for Disability Insurance Benefits (DIB) and supplemental security income (SSI) pursuant to 42 U.S.C. § 423.[2]

## Procedural History

Plaintiff applied for DIB and SSI on August 21, 2017, alleging in both a disability onset date of December 31, 2015 (Tr. 11). Plaintiff's original application was initially denied on November 29, 2017 and upon reconsideration on April 25, 2018. Plaintiff filed a written request for hearing on June 11, 2018. *Id.* A video hearing was subsequently held on May 16, 2019. *Id.* The ALJ found Plaintiff not disabled after determining she retained

---

[1] Plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. *See* Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto.

[2] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. §636(c) (*See* Doc. 20).

the residual functional capacity to perform a range of sedentary work (Tr. 17-25). The Appeals Council denied Plaintiff's request for review in 2020, making the ALJ's decision the final decision of the Commissioner. Plaintiff exhausted administrative remedies and filed a timely complaint with this Court.

## Issues Raised by Plaintiff

Plaintiff filed a short brief at Doc. 27 (3 pages handwritten). She asserts generally that she has ailments that qualify her for disability benefits, and that her past work is no longer available to her because of her disabilities and ailments. She requests the undersigned to "consider [her] claim and reverse the Administrative Law Judge decision" (Doc. 27, p. 3).[3]

## Applicable Legal Standards

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the applicable statutes.[4] Under the Social Security Act, a person is disabled if she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a).

To determine whether a claimant is disabled, the ALJ considers the following five

---

[3] Plaintiff is *pro se* here, and also appeared *pro se* at the agency level.

[4] The statutes and regulations pertaining to DIB are found at 42 U.S.C. § 423, *et seq.*, and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, *et seq.*, and 20 C.F.R. pt. 416.   As is relevant to this case, the DIB and SSI statutes are identical.   Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

questions in order: (1) Is the claimant presently unemployed? (2) Does the claimant have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform his former occupation? and (5) Is the claimant unable to perform any other work? *See* 20 C.F.R. § 404.1520.

An affirmative answer at either step 3 or step 5 leads to a finding that the claimant is disabled. A negative answer at any step, other than at step 3, precludes a finding of disability. The claimant bears the burden of proof at steps 1–4. Once the claimant shows an inability to perform past work, the burden then shifts to the Commissioner to show the claimant's ability to engage in other work existing in significant numbers in the national economy. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

It is important to recognize that the scope of judicial review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). Accordingly, this Court is not tasked with determining whether or not Plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). The Supreme Court defines substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does *not* reweigh evidence, resolve conflicts, decide

questions of credibility, or substitute its own judgment for that of the ALJ. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. *See Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

## The Decision of the ALJ

The ALJ followed the five-step analytical framework described above. He determined that Plaintiff had not engaged in substantial gainful activity since December 31, 2015, Plaintiff's first onset date (Tr. 13).

Plaintiff was born on February 2, 1973 and was 42-years old on the disability onset date (Tr. 24). The ALJ found that Plaintiff had severe impairments of acquired pes valgus[5] and equinus deformities bilaterally; posterior tibial tendon dysfunction of the left lower extremity; left foot hallux valgus with first MTP osteoarthritis and calcaneal spur; asthma; premature ventricular complexes and/or palpitations; and level one obesity (Tr. 13). The ALJ concluded that these impairments did not meet or equal a listed impairment (Tr. 16)

The ALJ found that Plaintiff had the RFC to perform light work as defined in 20 C.F.R. §404.1567(b) with the following limitations:

> She can occasionally climb ramps and stairs, but should never climb ladders, ropes, or scaffolding. She can occasionally stoop, kneel, crouch, and crawl. She should avoid concentrated exposure to extreme cold and extreme heat. She should avoid concentrated exposure to fumes, odors, dust, gases, and areas of poor ventilation.

---

[5] Acquired pes valgus is also known as "flatfeet," which is a common condition in which the arches on the inside of the feet flatten when pressure is put on them. This condition is usually painless, but if the person experiences pain, a doctor may evaluate them. *See* MAYO CLINIC, *Flatfeet*, https://www.mayoclinic.org/diseases-conditions/flatfeet/symptoms-causes/syc-20372604 (last visited September 29, 2022).

(Tr. 17).

Based on the testimony of a vocational expert ("VE"), the ALJ found that Plaintiff was unable to perform past relevant work (Tr. 23). Ultimately, the ALJ found Plaintiff was not disabled, though, because she was able to do other jobs that exist in significant numbers in the national economy (Tr. 24).

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in preparing this Memorandum and Order. The following summary of the record is directed to the points and factual allegations raised by Plaintiff.

### 1. Evidentiary Hearing

At the time of the May 16, 2019 hearing, Plaintiff was 43-years old (Tr. 32). Plaintiff proceeded *pro se* at the hearing and was informed by the ALJ about her right to counsel (Tr. 35-38). Additionally, the ALJ gave Plaintiff a copy of a document titled, "Important Notice About Representation" (Tr. 35). The ALJ explained to Plaintiff the different disability statutes and what it means to be found disabled prior to questioning her (Tr. 38-40). Finally, the ALJ discussed how the hearing would proceed as well as the exhibits and records currently before him (Tr. 40-46).

Plaintiff testified that she lives in an apartment and at the time of the hearing was not married (Tr. 47). Plaintiff lived with one minor child (Tr. 48). Plaintiff explained that her older child suffers from physical and mental disabilities, and receives disability benefits. *Id.* The older child lives by herself nearby and is assisted by Plaintiff and other

relatives. *Id.* Plaintiff helps her older child budget and also "get the things that she needs" (Tr. 49). Plaintiff graduated from high school and then completed one year of college (Tr. 47).

Plaintiff stopped working in 2015 because she started getting sick (Tr. 49). Prior to this, though, she worked in a number of security jobs. *Id.* Plaintiff explained that she was mostly at commercial facilities and as part of her duties, she helped operate the elevators and move things off of the elevator (Tr. 50-51). She explained that she had a desk in these positions and then every 2-3 hours, she would patrol by foot, sometimes walking from the 30th floor of a building down to the ground floor (Tr. 51). Plaintiff did not carry a weapon, but she was trained in methods of restraint and she also filled out paperwork as part of her job (Tr. 51-52). At her security jobs, Plaintiff testified that she had to screen boxes for security, so it required lifting and moving packages (Tr. 53).

Plaintiff also provided direct care to clients around 2012-2013 when she was still working at a security company (Tr. 49). She worked at a group home for individuals with cerebral palsy (Tr. 53-54). Plaintiff testified she would help the individuals by pushing them in their wheelchairs, lifting them out of their beds, and helping them into a chair and/or the tub (Tr. 54). This required her to lift adults over 100 pounds. *Id.*

The ALJ then questioned Plaintiff about her medical ailments. Plaintiff indicated that her ankle issues give her the most difficulty with her day-to-day functioning (Tr. 55-56). When she walks, her heart beats fast, so she was prescribed Metoprolol, which helps, but she has had to increase her dosage (Tr. 55). Plaintiff testified that she has arthritis in both knees, but her right knee is worse. *Id.* It will throb and sometimes feels like pins are

sticking in it. When she walks up and down stairs, it pops (Tr. 56). Plaintiff explained that she experiences joint pain on a daily basis. *Id.* To alleviate the pain, she goes to therapy for her ankle and will wrap it at times or put something warm on it (Tr. 57). Heat and cold make it worse, and she takes Tylenol to help with the pain. *Id.*

For her breathing, Plaintiff uses an inhaler (Tr. 57). Plaintiff has a rescue inhaler to use when her breathing becomes even more difficult, and she testified that she uses this inhaler a couple of times a week (Tr. 57-58). When she has a breathing problem, it usually lasts a few minutes (Tr. 58). Plaintiff testified that she also experiences bladder problems, but her doctor prescribed her medicine that she takes three times a day which seems to help improve her symptoms (Tr. 59). Plaintiff testified that with her bladder issues, she has to go to the bathroom, on average, 1-2 times an hour (Tr. 60-61).

Plaintiff takes a series of medications for her ailments, including Ranitidine for cramps and Zoloft (Tr. 62). Plaintiff also testified that she has depression and anxiety, and is prescribed Zoloft for these conditions (Tr. 69-70). Plaintiff's ailments still allow her to cook for herself and take care of herself (*e.g.,* she can put on her shoes) (Tr. 63). But she testified that her ailments impact how long it takes her to do chores around the house, like dishes and laundry. *Id.* Plaintiff does not drive anymore; rather, her children take her to her doctor's appointments or she takes public transportation (Tr. 66). Plaintiff can go shopping by herself but usually needs the motorized cart to get around (Tr. 65-66). Plaintiff spends time with family and will spend time with her grandchildren by watching movies together or watching them play in the community area of her home (Tr. 66). Plaintiff testified she can walk for about 5-10 minutes, but then needs a break and can

lift bags out of the car when she grocery shops (Tr. 67). Plaintiff struggles to sit for longer periods of time because she gets stiff and her bones pop. *Id.*

A VE also testified at the hearing. The VE testified that his testimony was consistent with the DOT (Tr. 71). The VE assessed Plaintiff's prior work as a cleaner/housekeeper (DOT number 323.687-014) as being unskilled with a Specific Vocational Preparation ("SVP") level of 2.[6] Generally, this position is defined as light exertional work (Tr. 72). The VE assessed Plaintiff's prior work as a security guard (DOT number 372.667-034) as a semi-skilled job with an SVP of 3[7] (Tr. 72). Similarly, the DOT defines this role as having a light physical demand level (Tr. 72). Lastly, Plaintiff's prior work as a therapy aide assistant (DOT number 355.377-014) was assessed as being semi-skilled with an SVP of 4[8] and a medium exertional level (Tr. 72).

The VE was questioned about a hypothetical individual who could perform the demands of medium work; can frequently climb ramps and stairs, but could never climb

---

[6] Specific vocational preparation, or "SVP", is the amount of time required for a typical claimant to learn the techniques, acquire the information, and develop the facility needed for average performance in a job. A claimant may acquire SVP in a school, military, institutional, or vocational environment through such settings as: vocational training, apprenticeship training, in plant training, on-the-job training, and essential experience in other jobs. For example, a registered nurse has an SVP of seven, which means that a claimant can learn this job in about 2-4 years. If the job is assessed as an SVP of 1, it means that only a short duration is needed to learn the job. In this case, a 2 means that it would take anything beyond a short demonstration up to and including one month to learn the job. *See here* DI 25001.001 Medical and Vocational Quick Reference Guide, available at https://secure.ssa.gov/poms.nsf/lnx/0425001001#a7 (last accessed September 28, 2022).

[7] An SVP of 3 means that it would take over 1 month up to and including 3 months to learn the job. *See here* DI 25001.001 Medical and Vocational Quick Reference Guide, available at https://secure.ssa.gov/poms.nsf/lnx/0425001001#a7 (last accessed September 28, 2022).

[8] An SVP of 4 means that it would take over 3 months up to and including 6 months to learn the job. *See here* DI 25001.001 Medical and Vocational Quick Reference Guide, available at https://secure.ssa.gov/poms.nsf/lnx/0425001001#a7 (last accessed September 28, 2022).

ladders, ropes, or scaffolding; could frequently stoop, kneel, crouch, and crawl; who should avoid concentrated exposure to extreme cold and extreme heat; and who should also avoid exposure to fumes, odors, dust, and gases in areas of poor ventilation. The ALJ asked if this hypothetical person could perform any of Plaintiff's prior work, and the VE testified that this person could perform the job duties of an assistant therapy aide (Tr. 72-73).

The ALJ then asked the VE to assess a hypothetical person who can perform sedentary work mainly while seated and that this individual could occasionally climb ramps and stairs, but never ladders, ropes, and scaffolding (Tr. 73). This hypothetical person could occasionally stoop, kneel, crouch, and crawl; should avoid the same respiratory irritants as outlined in the first hypothetical *supra* and also should avoid extreme cold, extreme heat, fumes, odors, dust, gases, areas of poor ventilation, and avoid concentrated exposure. *Id.* Additionally, this person has symptoms of depression, anxiety, and even pain, and has a high school education. The ALJ asked the VE if there are any jobs in the national market for this type of individual. The VE answered in the affirmative, and testified that this hypothetical person could perform the duties of a surveillance system monitor (DOT number 379.367-010, SVP 2, unskilled, sedentary) (Tr. 73-74). The VE testified that this position has 10,290 jobs in the national economy. The VE also testified that this person could perform the duties of dowel inspector (DOT 669-687-014, SVP of 1, unskilled, sedentary) with an estimated 236,020 jobs in the national market (Tr. 74). Finally, this hypothetical person could perform the duties of document preparer (DOT 249.587-018, SVP 2, unskilled, sedentary) with an estimated 117,700 jobs in the

national economy. *Id.* Additionally, the VE testified that these occupations exist in several regions in the country. *Id.*

If this hypothetical person needed additional breaks due to a bladder problem, for example, the VE testified that the additional breaks would be seen as an accommodation and there would not be any sedentary, unskilled occupations they could not perform (Tr. 74-75). Plaintiff also testified that she can do surveillance on a camera, but cannot lift things as part of a security job (Tr. 77).

### 2.     Relevant Medical Records

Plaintiff submitted medical records to aid the ALJ in his determination. The following medical records are focused on Plaintiff's claims.

#### I.     Heart Issues

Plaintiff sought treatment from a cardiologist, Dr. Nabil Alsharif, M.D., in June 2017 for complaints of chest pain, palpitations, and shortness of breath (Tr. 349). He ordered a range of workup, the results of which he described as negative (Tr. 353, 386, 392-96). When Plaintiff last saw him in September 2017, he offered no treatment recommendations (*i.e.*, "No care advice given for this encounter") (Tr. 388-89).

#### II.    Asthma

Plaintiff's medical records repeatedly repeat that she has a history of asthma. In April 2017, Plaintiff was using a rescue inhaler for shortness of breath with exertion (R. 367). She underwent pulmonary function testing in July 2017; however, the results were uncertain due to issues with Plaintiff during the exam (Tr. 443-44). The medical notes provide that Plaintiff "had difficulty doing the test and gave poor effort. Patient did not

take deep breaths or follow the instructions. Multiple trials were done throughout the test. The patient stated that it made her tired" (Tr. 444).

Plaintiff began treating with critical care specialist Subaila Zia. M.D., in September 2017 (Tr. 461). After reviewing previous testing, Dr. Zia concluded that the pulmonary function test was limited by Plaintiff's decreased effort and the findings should be "interpreted with caution" (Tr. 462). Additionally, Dr. Zia concluded that Plaintiff's alleged symptoms, including shortness of breath, wheezing, and chest pain, likely did not have a cardiac or pulmonary etiology (Tr. 465). However, she started Plaintiff on new respiratory medication that Plaintiff later reported improved her symptoms (Tr. 465, 518).

In February 2018, Plaintiff reported occasional cough and shortness of breath triggered by cold weather (Tr. 518). Dr. Zia recommended that she see a gastroenterologist for possible underlying gastroesophageal reflux disease (GERD) and undergo another pulmonary function test (Tr. 526). However, when Plaintiff last saw Dr. Zia in July 2018, she had not seen a gastroenterologist or obtained new pulmonary testing. Nevertheless, she reported that her respiratory symptoms were improved (Tr. 562). Dr. Zia wrote, "[h]er respiratory status does not limit her from doing any activity" (Tr. 562). Further, Dr. Zia noted normal respiratory functioning at each appointment she had with Plaintiff in 2017 and 2018 (Tr. 464, 525, 566).

III. Obesity

Plaintiff's body mass index (BMI) ranged from approximately 33 in 2017 (R. 487) to 35 in 2019 (R. 554).

IV.  Impairment of the Feet

Plaintiff visited Jason Liang, D.P.M., in March 2019 complaining of left foot pain that had persisted for a few months (Tr. 555). On examination, Dr. Liang noted intact sensation, full strength in both legs, decreased arches at both feet, and decreased ankle range of motion (Tr. 556). After reviewing imaging, he assessed her with mild hallux valgus (i.e., bunion), osteoarthritis at the first metatarsophalangeal joint, and a "tiny" plantar calcaneal spur. *Id.* He recommended alternative shoes and physical therapy (Tr. 557).

Plaintiff began physical therapy in April 2019 for left foot pain (Tr. 548-49). In May 2019, her physical therapist observed that she was wearing house slippers that offered no support after Plaintiff complained of a moderate level of pain (Tr. 545). Nevertheless, her therapist indicated Plaintiff's prognosis for full functional recovery was good. *Id.*

V.  Overactive Bladder

Urology specialist Anne Rose, N.P., began prescribing Plaintiff medication for overactive bladder in September 2017 when she presented for a urinary tract infection (Tr. 376). Between late 2017 and 2019, Plaintiff reported improved symptoms with adjustment in medication (Tr. 515, 553, 558, 560, 567). She complained of some residual issues with daytime frequency and urgency, but she did not report how frequently she needed to use the restroom (Tr. 558). At her most recent appointment of record in April 2019, Plaintiff reported good results with medication and reduction in consumption of soda (Tr. 553).

VI.     Kidney Nodules

Imaging done in July 2017 demonstrated nodules on Plaintiff's kidneys (Tr. 432). Urologist Srinivas Rajamahanty, M.D., reviewed the imaging but advised Plaintiff that the nodules were too small for intervention. He advised annual monitoring (Tr. 488).

VII.    Mental Health Issues

Plaintiff submitted medical records in which she complained of some symptoms associated with depression and anxiety in April 2017 to a primary care physician (Tr. 366, "[F]eels depressed less than half the days of week, feels overwhelmed [and some] anxiety most days. No thoughts self harm, no hx of any psychiatric dx, never been on meds."). However, she deferred counseling due to the mild nature of her symptoms and wanted to readdress at a follow-up meeting (Tr. 367). Her primary care physician prescribed 50 mg Zoloft in May 2017 that improved her anxiety, while also noting that Plaintiff's mental status was "normal mood and affect and active and alert" (Tr. 359, 365). Thereafter, she did not report experiencing mental health symptoms and her providers did not document observations indicating that she experienced any symptoms (*E.g.*, Tr. 517, 554, 561).

**3. Agency Forms**

In a Function Report dated October 8, 2017, Plaintiff details that her conditions limit her ability to walk, as she gets winded after walking (Tr. 236). Additionally, if she stands for too long, she feels pain. She has an overactive bladder, fatigue, and anxiety as well. *Id.* Even so, she is ablet to take care of herself (*e.g.,* wash her face and brush her teeth) as well as take care of housework, chores, and making meals (Tr. 237).

In a second Function Report, dated March 15, 2018, Plaintiff indicates that her ailments limit her in her ability to walk, sit, or stand for long periods of time (Tr. 284). She gets winded easily when walking and bending over causes her heart to beat fast. *Id.* She has issues with her bladder and stomach, as well as pain and swelling in her legs. *Id.* Despite these conditions, Plaintiff indicates she prepares and cooks food and can clean her home, even if she has to stretch the routine out over the course of a week to account for breaks (Tr. 285). Plaintiff does need help lifting items upstairs to her apartment, as well as with transportation (Tr. 286). She further explains that she cannot squat or bend her knees because they are too weak; walk for long periods of time; kneel; climb the stairs; and concentrate when she is worried (Tr. 288).

**4. State Agency Consultants' Opinions**

In connection with Plaintiff's application for benefits, the ALJ also considered evidence and opinions from prior administrative findings at Plaintiff's initial stages of applying for benefits.

State agency reviewing physician Frank Mikell, M.D., determined that Plaintiff could perform the full range of medium exertional activity after reviewing Plaintiff's medical records (Tr. 84-85, 92-93). State agency reviewing physician Lenore Gonzales, M.D., found Plaintiff could perform medium exertional work except she could never climb ladders, ropes, or scaffolds and she could frequently climb ramps and stairs, stoop, kneel, crouch, and crawl. She had to avoid concentrated exposure to extreme temperatures, fumes, odors, dust, gases, and poor ventilation (Tr. 106-08, 120-23). State agency psychological consultant Donald Henson, Ph.D., found Plaintiff's mental

impairments were not severe (Tr. 104-05, 118-19). Dr. Henson summarized Plaintiff's medical records, including that Plaintiff has a history of anxiety and takes Zoloft (Tr. 104). Plaintiff's submitted mental health medical records repeatedly recorded that Plaintiff has "normal judgment" and "normal mental status" (Tr. 105).

## Analysis

The ALJ reasonably concluded that the record supports a conclusion that Plaintiff was capable of a limited range of sedentary work as of her date last insured. Plaintiff does not offer any specific challenge to that conclusion beyond asserting that she meets the basic standards for disability, reiterating her diagnoses, and listing her current medications, all of which were before the ALJ when he made his decision.

The ALJ fairly summarized the relevant medical evidence related to Plaintiff's kidney issues, heart issues, asthma/shortness of breath, anxiety/depression, overactive bladder, and arthritis/inflammation (Tr. 17-23). Additionally, while Plaintiff claimed a disability onset date of December 31, 2015, the established care medical records indicate that she started treatment for her ailments in April 2017 (Tr. 19). The ALJ's assessment of Plaintiff's RFC was supported by the medical records and the opinion of two state agency consultants. It is proper for the ALJ to rely upon the assessment of a state agency consultant. *Schmidt v. Barnhart*, 395 F.3d 737, 745 (7th Cir. 2005); *Cass v. Shalala*, 8 F.3d 552, 555 (7th Cir. 1993). "State agency medical and psychological consultants are highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the Act." SSR 96-6p, 1996 WL 374180, at *2. Ultimately, the ALJ determined that Plaintiff's RFC was appropriate based on the medical record, the

State agency consultants' determination, Plaintiff's activities, and the record as a whole (Tr. 23).

The Court has carefully reviewed the record and the ALJ's decision and has not detected any legal errors. The medical evidence and the state agency consultants' opinions support the conclusion that Plaintiff was capable of doing some sedentary jobs as of her date last insured. In fact, during the hearing, Plaintiff herself testified that she can do the sedentary position of monitoring a surveillance camera (Tr. 77). This contention is consistent with Plaintiff's own reports of her abilities in her Function Reports (Tr. 235-246; 280-293). In these reports, Plaintiff indicates she does retain the ability to make meals and do chores, but that mobility can present an issue for her at times. Even if reasonable minds could differ as to whether plaintiff was disabled at the relevant time, the ALJ's decision must be affirmed if it is supported by substantial evidence, and the Court cannot substitute its judgment for that of the ALJ in reviewing for substantial evidence.  *Burmester*, 920 F.3d at 510; *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012). Here, Plaintiff has failed to identify a reason for reversal and remand, and an independent analysis of the record shows that the ALJ rested its decision on substantial evidence. As such, the ALJ's decision must be affirmed.

## Conclusion

After careful review of the record as a whole, the Court is convinced that the ALJ committed no errors of law, and that the ALJ's findings are supported by substantial evidence. Accordingly, the final decision of the Commissioner of Social Security denying Plaintiff's application for disability benefits is **AFFIRMED**.

The Clerk of Court is directed to enter judgment in favor of Defendant.

**IT IS SO ORDERED.**

**DATED: September 30, 2022**

                                                  **s/ Mark A. Beatty**
                                                  **MARK A. BEATTY**
                                                  **United States Magistrate Judge**